

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-11-1998

# Larsen v. Senate of The Commonwealth

Precedential or Non-Precedential:

Docket 97-7153

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Larsen v. Senate of The Commonwealth" (1998). *1998 Decisions*. Paper 194.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/194

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7153

ROLF LARSEN

v.

SENATE OF THE COMMONWEALTH OF PENNSYLVANIA;
ROY C. AFFLERBACH; ANTHONY B. ANDREZESKI;
GIBSON E. ARMSTRONG; EARL BAKER; ALBERT V.
BELAN; CLARENCE D. BELL; LEONARD J. BODACK;
MICHAEL E. BORTNER; DAVID J. BRIGHTBILL;
J. DOYLE CORMAN; MICHAEL M. DAWIDA; MICHAEL
B.
FISHER; VINCENT J. FUMO; STEWART J. GREENLEAF;
MELISSA A. HART; DAVID W. HECKLER; EDWARD W.
HELFRICK; EDWIN G. HOLL; ROXANNE H. JONES;
ROBERT C. JUBELIRER; GERALD J. LAVALLE;
CHARLES D. LEMMOND, JR.; H. CRAIG LEWIS;
J. WILLIAM LINCOLN; F. JOSEPH LOEPER; ROGER
A.
MADIGAN; BRUCE S. MARKS; ROBERT J. MELLOW;
HAROLD F. MOWERY, JR.; RAPHAEL J. MUSTO;
MICHAEL A. O'PAKE; FRANK A. PECORA; JOHN E.
PETERSON; EUGENE E. PORTERFIELD; TERRY L. PUNT;
JEANETTE F. REIBMAN; JAMES J. RHOADES;
ROBERT D. ROBBINS; FRANK A. SALVATORE;
ALLYSON Y. SCHWARTZ; TIM SHAFFER; JOHN J.
SHUMAKER; PATRICK J. STAPLETON, WILLIAM J.
STEWART; J. BARRY STOUT; RICHARD TILGHMAN; JACK
WAGNER; NOAH W. WENGER; HARDY WILLIAMS;
SUPREME COURT OF PENNSYLVANIA; ROBERT NIX;
JOHN FLAHERTY; STEPHEN ZAPPALA; NICHOLAS
PAPADAKOS; RALPH CAPPY; FRANK MONTEMURO;
RONALD CASTILLE; COMMONWEALTH OF
PENNSYLVANIA COURT OF JUDICIAL DISCIPLINE;
JOSEPH F. MCCLOSKEY; WILLIAM F. BURNS;
DAWSON R. MUTH; PETER DEPAUL; CAROL K.

MCGINLEY, CHRISTINE L. DONOHUE; JUSTIN M.
JOHNSON; WILLIAM CASSENBAUM; JUDICIAL CONDUCT
BOARD; JOSEPH A. DEL SOLE; ARTHUR J. EDMUNDS
              ;
DIANE M. EDMUNDSON; GERALD P. EGAN; JOHN W.
HERRON; FREDERICK WELLS HILL; MATTHEW ANITA
MACDONALD; GERALD J. O'CONNOR; ANDREW PALM;
CHARLES W. RUBENDALL, II; JAMES E. RUSSO,
BERNARD C. WATSON; WILLIAM J. ARBUCKLE, III;
BRUCE A. ANTKOWIAK; THOMAS A. BERGSTROM;
ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS*;
NANCY M. SOBOLEVITCH; DAVID A. FRANKFORTER, in
their official and individual capacities;
INDIVIDUAL SENATORS

        Chief Justice Robert N.C. Nix
        (retired), Chief Justice John
        Flaherty, Associate Justices
        Stephen Zappala, Nicholas
        Ronald Castille, and Judge
        Frank Montemuro, *The
        Administrative Office of
        Pennsylvania Courts, Nancy M.
        Sobolevitch and David A.
        Frankforter,

        Appellants

*Dismissed pursuant to Clerk order dated 6/27/97

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 95-CV-01540)

Argued May 19, 1998

BEFORE: SLOVITER, GREENBERG, and GIBSON,*
Circuit Judges

(Filed: August 11, 1998)
_____

*Honorable John R. Gibson, Senior Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

       Arlin M. Adams (argued)
       Joseph T. Lukens
       Michael J. Barry
       Schnader, Harrison, Segal &
        Lewis, L.L.P.
       1600 Market Street, Suite 3600
       Philadelphia, PA 19103

       Attorneys for Appellants
       Individual Justices of the
       Supreme Court of Pennsylvania

       Arthur G. Raynes
       Harold I. Goodman
       Stephen E. Raynes
       Raynes, McCarty, Binder Ross &
        Mundy
       1845 Walnut Street, Suite 2000
       Philadelphia, PA 19103

       Attorneys for Appellants
       Individual Administrative Office
       Defendants

       Cletus P. Lyman (argued)
       Michael S. Fettner
       Lyman & Ash
       1612 Latimer Street
       Philadelphia, PA 19103

       Attorneys for Appellee Rolf Larsen

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Appellants, present and former justices and court
administrators of the Supreme Court of Pennsylvania,
appeal from the district court's February 28, 1997 order

3

denying their motion to dismiss appellee Rolf Larsen's claims against them on qualified immunity grounds. The district court had jurisdiction over Larsen's claims pursuant to 28 U.S.C. S 1331 and 28 U.S.C.S 1343 as Larsen states his claims under 42 U.S.C. S 1983 and 42 U.S.C. S 300bb. Jurisdiction over this appeal from a denial of qualified immunity rests on 28 U.S.C. S 1291 pursuant to the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817 (1985). For the reasons that follow, we will affirm in part and reverse in part the district court's denial of qualified immunity and will remand the case to the district court for further proceedings.

II. FACTUAL AND PROCEDURAL HISTORY

This case arises from appellants' June 1994 decision to terminate the medical insurance benefits of appellee Rolf Larsen, a former justice of the Supreme Court of Pennsylvania, following his conviction on felony charges in the Allegheny County Court of Common Pleas and his suspension from office pursuant to an order of the Pennsylvania Court of Judicial Discipline. In November 1977, Larsen was elected to a ten-year term on the Pennsylvania Supreme Court beginning in January 1978. In November 1987, Larsen won a retention election for a second ten-year term beginning in January 1988. On December 12, 1989, toward the end of Larsen's 12th year as a Supreme Court justice, the Supreme Court adopted a benefits plan which provided lifetime medical insurance benefits for retired judges with ten or more years of judicial service, regardless of their age. See app. at 93.

On July 17, 1991, the Pennsylvania Judicial Inquiry Review Board ("JIRB"), following an investigation into allegations of misconduct, reported to the Pennsylvania Supreme Court that Larsen had created an appearance of impropriety by engaging in ex parte communications with a trial judge in a pending case. The JIRB recommended that Larsen be reprimanded publicly. See app. at 72. On October 14, 1992, the Supreme Court, acting through a panel of three justices, adopted the JIRB's recommendation and issued an order publicly reprimanding Larsen. See In

4

re Larsen, 616 A.2d 529 (Pa. 1992). Justices Zappala and Cappy voted in favor of the order while Justice Papadakos dissented.

On November 24, 1992, Larsen filed a petition before the Supreme Court seeking the disqualification and recusal of Justices Zappala and Cappy on the grounds that these justices, together with Chief Justice Nix and other individuals, had engaged in various forms of misconduct involving ex parte communications, kickbacks, partiality toward litigants and interference in pending cases. See app. at 72–73; 769. A grand jury then commenced a nine-month investigation into Larsen's accusations and on November 5, 1993, released a report stating that it had found evidence of further wrongdoing by Larsen.[1] The grand jury reported that Larsen had maintained a list of petitions for allowance of appeal to be afforded special handling by his staff and had obtained prescription tranquilizers for his own use by causing a physician to issue prescriptions in the names of members of his judicial staff. See app. at 76.

The Attorney General of Pennsylvania, acting on a presentment issued by the grand jury on October 22, 1993, brought criminal charges against Larsen relating to his unlawful acquisition of prescription medications. By order dated October 28, 1993, the Supreme Court relieved Larsen of all judicial and administrative duties as a justice, but did not suspend his pay. See app. at 76.

On November 23, 1993, the Pennsylvania House of Representatives adopted House Resolution Number 205 authorizing its judiciary committee to investigate Larsen. See app. at 77. That investigation culminated in a writ of impeachment summons which eventually resulted in Larsen's conviction on October 4, 1994. See app. at 790. Larsen has brought claims challenging various aspects of the impeachment proceedings. Those claims are the subject

_____

1. While the 1992 grand jury reported no evidence to substantiate Larsen's accusations against the other justices, the United States District Court for the Eastern District of Pennsylvania later found that Chief Justice Nix had interfered substantially in a pending criminal case. See Yohn v. Love, 887 F. Supp. 773 (E.D. Pa. 1995), aff 'd in relevant part, 76 F.3d 508 (3d Cir. 1996).

5

of separate appeals before this court and thus we do not address them in this opinion.

On April 9, 1994, after a five-day trial before the Court of Common Pleas of Allegheny County, a jury convicted Larsen of two counts of felony conspiracy for unlawful procurement of controlled substances. See app. at 77.[2] On June 3, 1994, the Pennsylvania Court of Judicial Discipline suspended Larsen from office without pay based on Article V, S 18(d)(2) of the Pennsylvania Constitution, which authorizes orders "directing the suspension, with or without pay, of any justice, judge or justice of the peace .. . against whom has been filed an indictment or information charging a felony." See In re Larsen, 655 A.2d 239 (Pa. Ct. Judic. Disc. 1994).

The Court of Common Pleas sentenced Larsen on June 13, 1994, and as part of its sentence removed Larsen from judicial office pursuant to Article VI, S 7 of the Pennsylvania Constitution, which provides that, "[a]ll civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime." See Larsen v. Senate of Pennsylvania , 646 A.2d 694, 697 (Pa. Commw. Ct. 1994).

In a letter dated June 17, 1994, David A. Frankforter, Human Resources Manager for the Court Administrator of Pennsylvania, acting on behalf of Court Administrator Nancy Sobolevitch and the justices of the Pennsylvania Supreme Court, notified Larsen that he was ineligible to receive retirement medical benefits as of June 3, 1994, the date of the Court of Judicial Discipline order suspending Larsen without pay. See app. at 94.

Until 1993, the Pennsylvania Constitution contained a provision mandating that, "[n]o compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office. . . ." Pa. Const. art. V, S 16(b). In a 1992 decision, the Pennsylvania Supreme

_____

2. Larsen contended that the prescription tranquilizers were medically necessary and that he had them prescribed in the names of third parties to protect his privacy.

6

Court, analyzing the language and history of that provision, held that its denial of "compensation" to suspended or removed judges did not encompass retirement benefits. Thus, the court held that judges who had been removed from office for misconduct could not be denied retirement benefits based on that provision. See Glancey v. State Retirement Bd., 610 A.2d 15, 22-23 (Pa. 1992).

In 1993, section 16 was amended to provide that, "[e]xcept as provided by law, no salary, retirement benefit or other compensation, present or deferred, shall be paid to any justice, judge or justice of the peace who . . . is suspended, removed or barred from holding judicial office." Pa. Const. art. V, S 16(b). Therefore, in contrast to the prior version of section 16(b) which addressed only "compensation," the 1993 version explicitly encompassed retirement benefits and other forms of deferred compensation and provided for the denial of such benefits upon removal.

Larsen commenced this action on September 13, 1995, by filing a complaint in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C.S 1983 which, insofar as material to this opinion, alleged that appellants' June 17, 1994 decision to terminate his medical benefits violated his rights under the Impairment of Contracts Clause, U.S. Const. Art. I, S 10, the Due Process and Equal Protection Clauses, U.S. Const. amend. XIV, S 1, the First Amendment, U.S. Const. amend. I, and the Public Health Services Act, 42 U.S.C. SS 300bb-1 et seq. Appellants moved to dismiss Larsen's claims on the grounds that his complaint failed to state a claim on which relief could be granted and that his claims were barred by the doctrine of qualified immunity. In an opinion and order dated February 28, 1997, the district court denied appellants' assertion of qualified immunity. See Larsen v. Senate of the Commonwealth of Pennsylvania, 955 F. Supp. 1549, 1580 n.31 (M.D. Pa. 1997). Appellants filed a timely notice of appeal on March 27, 1997.[3]

_____

3. By orders dated June 18, 1997, and September 30, 1997, this appeal was consolidated with, respectively, the appeals in numbers 97-7296 and 97-7451 which concern Larsen's challenge to his impeachment. This opinion, however, concerns only the appeal in number 97-7153.

7

III. DISCUSSION

A. Clearly Established Rights

Initially we set forth the framework for our analysis. In Seigert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793 (1991), the Supreme Court explained that when a qualified immunity defense is raised a court first should determine whether the plaintiff has asserted a violation of a constitutional right at all. Only if that question is answered affirmatively need the court determine whether the defendant is entitled to qualified immunity on the grounds that his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). The Court recently reaffirmed this principle in County of Sacramento v. Lewis, 118 S.Ct. 1708, 1714 n.5 (1998). In this case we largely focus on the second question because we are satisfied that except with respect to the equal protection of the law and the Public Health Services Act claims Larsen adequately asserted a violation of his constitutional rights.

In considering the second question we recognize that qualified immunity is from suit as well as from liability, so that "[u]nless the plaintiff 's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. For purposes of this appeal from the district court's denial of qualified immunity based upon the pleadings, we must accept Larsen's allegations as true and afford him the benefit of all reasonable inferences. See Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996). Appellants' entitlement to qualified immunity under these standards is a question of law subject to plenary review. See Pro v. Donatucci, 81 F.3d 1283, 1285 (3d Cir. 1996); Giuffre v. Bissell, 31 F.3d 1241, 1247 (3d Cir. 1994). 4

_____

4. The district court addressed the qualified immunity issue as follows:

    [appellants'] arguments in support of qualified immunity are limited
    to the same arguments they assert in support of the outright

A right is "clearly established" for qualified immunity purposes only if "[t]he contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1982). Thus, defendants are entitled to qualified immunity if"reasonable officials in [their] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." In re City of Philadelphia Litig., 49 F.3d 945, 961 n.14 (3d Cir. 1995). Even where officials "clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles." Acierno v. Cloutier, 40 F.3d 597, 620 (3d Cir. 1994) (citations and internal quotations marks omitted).

However, for reasonable officials to be on notice that their conduct would be unlawful, there need not be "a previous precedent directly on point." Acierno, 40 F.3d at 620; accord Anderson, 483 U.S. at 640, 107 S.Ct. 3039 (holding that the "clearly established" standard does not require that "the very action in question has previously been held unlawful"). Rather, there need only be "some but not precise factual correspondence between relevant precedents and the conduct at issue," Pro, 81 F.3d at 1292 (citations and internal quotation marks omitted), so that "in the light of pre-existing law the unlawfulness [would be] apparent." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. We must

_____

      dismissal of Larsen's claims. As the court has determined that these
      arguments provide no basis upon which to dismiss Larsen's . . .
      claims, they also provide no basis upon which to afford [appellants]
      immunity from suit in their personal capacities.

Larsen, 955 F. Supp. at 1580 n.31. Thus the court did not distinguish the issue of whether the complaint alleged viable claims for purposes of Federal Rule of Civil Procedure 12(b)(6) from the issue of whether it alleged violations of clearly established rights within the meaning of the qualified immunity doctrine. Our analysis largely turns on a de novo inquiry as to the latter issue, see Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815, as we are satisfied that for the most part Larsen adequately has asserted a violation of his constitutional rights.

determine, in light of these principles, whether Larsen alleges violations of clearly established rights. 5

B. Impairment of Contracts Clause

Appellants contend that the district court erred in denying them qualified immunity as to Larsen's claim that termination of his benefits violated his rights under the Impairment of Contracts Clause, which provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, S 10. According to appellants, Larsen's right to receive those benefits following his removal from office was not clearly established, since reasonable officials could have believed either that Larsen was not eligible for benefits under the terms of the benefits plan, or that Larsen, even if otherwise eligible for benefits, lawfully could be denied those benefits pursuant to the 1993 version of Article V, section 16, of the Pennsylvania Constitution which precludes payment of benefits to justices who have been removed from office.

1. Eligibility Under the Retirement Benefits Plan

Appellants contend that Larsen fails to allege a clearly established right to receive retirement medical benefits because, according to his complaint, the plan conferring the right to those benefits applied only to "retired" members of the judiciary. Thus, appellants argue, a reasonable official "would have been justified in concluding that Larsen was not covered" by the terms of the benefits plan since he

_____

5. Larsen, br. at 14, contends that the doctrine of qualified immunity is inapplicable because appellants' revocation of his medical benefits involved "a ministerial, non-discretionary act." See People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 143 (3d Cir. 1984). We disagree. As the Supreme Court recognized in Davis v. Scherer, 468 U.S. 183, 195 n.14, 104 S.Ct. 3012, 3020 n.14 (1984), officials must make discretionary determinations even in the course of applying facially clear provisions. Because appellants' decision to deny Larsen's benefits required such discretionary determinations, including legal analysis as to the applicability of the 1993 version of section 16(b), it cannot be characterized as a ministerial act outside the scope of the qualified immunity doctrine.

10

had been removed from office and had not "retired" voluntarily. Br. at 12. We disagree. As of the time appellants decided to deny Larsen's benefits, the Pennsylvania Supreme Court had held that judicial officers who had been removed from office for misconduct were entitled to receive benefits under a plan which by its terms applied to "retired" judicial officers. In upholding removed judges' right to receive "retirement" benefits, the Pennsylvania Supreme Court did not find it significant that those judges had not "retired" voluntarily from office. Rather, the court treated them as fully eligible under the retirement plan and proceeded to analyze whether a separate provision of law precluded them from receiving those benefits to which they were entitled under the plan. See Glancey, 610 A.2d at 22-23.6  The decision in Glancey forecloses appellants' argument that officials charged with administering a retirement benefits plan reasonably could construe the terms of that plan narrowly to exclude removed judges from coverage when the Pennsylvania Supreme Court had included such individuals in the terms of eligibility.7

In light of this case law including individuals such as Larsen within the terms of eligibility for retirement benefits, and in the absence of any authority for excluding individuals from eligibility under a retirement plan on the

_____

6. Glancey resolved the cases of several different judges, some of whom were removed while still in office and others of whom were not issued removal orders until after they had resigned or retired. The court treated those judges identically in terms of their eligibility for benefits under the retirement plan. See 610 A.2d at 22-23.

7. The Pennsylvania Supreme Court had reached similar results in cases involving "retirement" plans for elected officials and public employees, upholding the eligibility under such plans of individuals who did not retire voluntarily. See Bellomini v. State Retirement Bd., 445 A.2d 737, 741 (Pa. 1982) (holding that legislators who resigned under pressure at about the time of their criminal convictions were entitled to "retirement" benefits); Harvey v. Retirement Bd. of Allegheny County, 141 A.2d 197, 203 (Pa. 1958) (holding that public employee who had been dismissed for cause was entitled to "retirement" benefits); Wright v. Retirement Bd. of Allegheny County, 134 A.2d 231, 233-34 (Pa. 1957) (holding that public employee who had been separated involuntarily from employment was entitled to "retirement" benefits).

11

grounds that they were involuntarily removed from office, we find that it was clearly established that Larsen could not be disqualified from receiving benefits under the terms of the benefits plan. Accordingly, we must consider whether appellants are entitled to qualified immunity on the grounds that they reasonably could have believed that Article V, section 16, as amended in 1993, operated to divest Larsen of benefits which he otherwise would have been eligible to receive.

2. Divestiture of Benefits Pursuant to Section 16

Appellants contend that they are entitled to qualified immunity because a reasonable official could have believed that their revocation of Larsen's benefits was lawful pursuant to the 1993 version of section 16, which provides that judges who are suspended or removed from office shall not receive any "salary, retirement benefit or other compensation, present or deferred." Pa. Const. art. V, S 16(b). Larsen, however, contends that the application of that provision violated his clearly established rights, as it was adopted after his right to retirement benefits had vested in 1989, at which time he had completed ten years of service and thus had satisfied all requirements necessary to receive full retirement benefits.[8]  Larsen emphasizes that the version of section 16 in effect at the time his rights vested did not revoke retirement benefits upon removal from office. See Glancey, 610 A.2d at 22–23. Thus, Larsen argues that the 1993 amendment to that provision unilaterally altered the terms of his employment compensation, retroactively depriving him of contractual rights which had vested before the amendment and violating his right against impairment of contractual obligations. See br. at 19.

We agree. The Pennsylvania Supreme Court has held that,

_____

8. Vesting occurs when an individual "has completed the number of years of service required for eligibility" to receive benefits under the terms of a retirement plan. Police Pension Fund Ass'n Bd. v. Hess, 562 A.2d 391, 395 (Pa. Commw. Ct. 1989).

12

[i]t has long been recognized in Pennsylvania that the nature of retirement provisions for public employees is that of deferred compensation for service actually rendered in the past. And it is the law of this Commonwealth that unilateral modifications . . . after retirement eligibility requirements have been met, may not be adverse to the [employee].

Commonwealth ex rel. Zimmerman v. Officers & Employees Retirement Bd., 461 A.2d 593, 595 (Pa. 1983) (citations omitted). In Zimmerman, the Commonwealth sought to terminate a public official's retirement benefits based on a statute providing for forfeiture of the right to such benefits upon conviction of a crime related to public office. The court, finding that the official's vested right to retirement benefits had accrued before enactment of the statute, held that that right "cannot be reached by a retroactive forfeiture provision," and thus upheld the official's right to receive retirement benefits despite his conviction for crimes that warranted forfeiture under the statute. See id. at 598.

In reaffirming its decision on reargument, the court reiterated that, "[i]t is [the] attempt to divest previously vested rights of a public . . . official by subsequent legislative judgment that we find to be a constitutionally impermissible retroactive divestment of vested rights." Commonwealth ex rel. Zimmerman v. Officers & Employees Retirement Bd., 469 A.2d 141, 142 (Pa. 1983) (per curiam). Justice Zappala, one of four justices who joined in the majority opinion, wrote separately "to emphasize that no law, regardless of how noble its purpose may retroactively affect existing contract obligations. U.S. Const. art. 1 S 10. cl. 1. . . . Once a contractual obligation vests . .. the same cannot be altered, amended or changed by unilateral action." 469 A.2d at 144 (Zappala, J., concurring). We find that these precedents analyzing an impairment of contract claim under circumstances closely analogous to those in the present case clearly establish that retirement benefits could not lawfully be denied based upon a provision adopted after the right to receive those benefits had vested.9

_____

9. Because Larsen's right to retirement benefits had vested before adoption of the 1993 constitutional amendment, we need address only the implications of applying that amendment retroactively to previously vested rights. Accordingly, our opinion has no application to individuals whose rights vested after 1993.

13

Appellants contend that Zimmerman is distinguishable because the official in that case had begun receiving benefits before the Commonwealth sought to terminate them. However, Zimmerman expressly noted that the court's prior decisions had established that a subsequently adopted provision "could not prevent the payment of benefits to employees whose . . . rights were vested in enjoyment" before passage of the provision. See id. at 143 (citing Bellomini v. State Employees' Retirement Bd., 445 A.2d 737 (Pa. 1982)). The court then held that the same principle applied where the official's "right in the terms of entitlement, although not enjoyment, had vested" before passage of the benefits forfeiture provision. Id. Thus, Zimmerman establishes that the dispositive time after which an employee's right to benefits cannot be altered is the time of the vesting of those rights "in the terms of entitlement." In this case, Larsen's right to retirement benefits vested in terms of entitlement in 1989, at which time he had satisfied all conditions necessary to receive full retirement benefits, and under the law that existed at that time, those benefits could not be terminated upon removal from office. See Glancey, 610 A.2d 15. Accordingly, it was clearly established that Larsen could not be denied benefits based upon a provision adopted in 1993.[10]

Numerous other Pennsylvania cases have reached the same result precluding infringements on previously vested rights based on rules that did not exist at the time of vesting. In Association of Pennsylvania State College & Univ. Faculties v. State Sys. of Higher Educ., 479 A.2d 962, 965 (Pa. 1984), the court, applying both the federal and state Impairment of Contracts Clauses, held that the "constitutional infirmity" of an adverse amendment of previously existing rules "with respect to [employees] whose entitlement to retirement benefits had already vested is clear." Thus, the court held that the amendment was "void

_____

10. Zimmerman, in dictum, distinguished the situation before it from a situation where a removal due to misconduct would result in the official's "failure . . . to complete the term of eligibility." See 469 A.2d at 143. This dictum does not apply to Larsen, who had satisfied the term of eligibility before he was removed from office and before the benefits forfeiture provision was adopted.

14

as applied to employees whose rights were vested prior to its enactment." Id.; accord Burello v. State Employes' Retirement Sys., 411 A.2d 852, 855 (Pa. Commw. Ct. 1980) (citations omitted) ("[W]hen the conditions of retirement eligibility have been satisfied, retirement pay has ripened into a full contractual obligation and become a vested right [which] cannot be disturbed by subsequent legislation."); Harvey v. Allegheny County Retirement Bd., 141 A.2d 197, 203 (Pa. 1958) (holding that employee who had "complied with all conditions necessary" to receive benefits "cannot be affected adversely by subsequent legislation which changes the terms of the retirement contract"); Wright v. Allegheny County Retirement Bd., 134 A.2d 231, 233-34 (Pa. 1957) (holding that a provision which was adopted after an employee's rights had vested but before employee retired could not lawfully be applied, as the employee's rights were "vested and unqualified" under the previously existing law and "could not be qualified or altered" by a subsequent enactment).11

_____

11. The Pennsylvania Impairment of Contracts Clause provides that, "[n]o . . . law impairing the obligation of contracts . . . shall be passed."
Pa. Const. art. I, S 17. Because the Pennsylvania cases discussed above apply the federal Impairment of Contracts Clause, see, e.g., Association of Pennsylvania State College & Univ. Faculties, 479 A.2d at 964; Zimmerman, 469 A.2d at 144 (Zappala, J., concurring); Burello, 411 A.2d at 855, they clearly establish Larsen's rights under federal law, particularly absent any federal precedent to the contrary. See Mississippi v. Miller, 276 U.S. 174, 179, 48 S.Ct. 266, 268 (1928) (holding that "retroactive application" of a law adopted "after services have been rendered" would deprive employee of an amount "he had theretofore earned" and thus "would impair the obligation of the . . . contract" that existed at the time service was rendered). In Dodge v. Board of Educ. of Chicago, 302 U.S. 74, 77-78, 58 S.Ct. 98, 99-100 (1937), the Court permitted an impairment of retirement benefits, but did so on the grounds that state law rendered those benefits "mere gratuities" that did not give rise to vested contractual rights. Thus, Dodge is inapposite in this case where the benefits are a form of deferred compensation to which employees have enforceable contractual rights, see Zimmerman, 469 A.2d at 142 ("[W]e have rejected the view that pension benefits are mere gratuities . . . . [I]t is the well settled law of this jurisdiction that
the nature of retirement provisions . . . is that of deferred compensation for services actually rendered in the past.") (citations omitted), and does
not alter the fact that nothing in the federal precedents blurs the clearly

15

Appellants, br. at 12-13, argue that despite these cases clearly holding that retroactive denials of previously vested rights to retirement benefits unconstitutionally impair a contractual obligation to pay those benefits, the contours of Larsen's rights were not clearly established because cases analyzing impairments of contract have held that afinding of a "technical impairment is merely a preliminary step in resolving the more difficult question of whether that impairment is permitted under the Constitution," United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517 (1976) (citations and internal quotations omitted), and therefore have analyzed the nature, purpose, and extent of the impairment in light of the public interests at stake. See Association of Surrogates & Supreme Court Reporters v. New York, 940 F.2d 766, 771 (2d Cir. 1991). We find this argument unpersuasive. As of the time of appellants' decision, the Pennsylvania Supreme Court had considered and rejected the argument that public interests in sanctioning official misconduct warranted retroactive impairment of vested rights. The court held that,"any

_____

established contours of the rights under the federal Impairment of Contracts Clause which are set forth in the Pennsylvania cases.

In this case the provision adopted after vesting was set forth in the state constitution whereas in the cases discussed above, the provisions purporting to infringe the right to benefits were adopted by statute or ordinance. However, it was clearly established that,"[a] state can no more pass a law violating the obligation of a contract by means of a convention than by its legislature, so a provision in a state constitution which prohibits the enforcement of a contract is void." Fisk v. Police Jury
of Jefferson, 116 U.S. 131, 135, 6 S.Ct. 329, 331 (1885) (citations omitted); accord McBride v. Retirement Bd. of Allegheny County, 199 A. 130, 132-33 (Pa. 1938) ("the Contract Clause of the Federal Constitution . . . forbids impairment by the states, not only by statute, but also by amendment to . . . the State Constitution") (citations omitted). Moreover, nothing in the cases addressing retroactive statutory impairments of vested rights suggests that their holdings turn on the source of the retroactive law. Thus, the contours of the right against retroactive impairment were clearly established when appellants terminated Larsen's benefits despite the lack of "precise factual correspondence" between this case and those where the subsequently enacted provision was statutory. See Pro, 81 F.3d at 1292.

16

argument predicated upon a compelling state interest must necessarily fail when applied to this attempted retroactive forfeiture" of previously vested retirement benefits. See Zimmerman, 461 A.2d at 598.12 Thus, officials charged with administering a retirement benefits plan could not reasonably have believed, in light of the decided cases construing the scope of the Impairment of Contracts Clause, that the balance of interests rendered the impairment of Larsen's rights lawful.

Based on the cases discussed above, we find that Larsen, by alleging that he was deprived of previously vested rights pursuant to a provision adopted after vesting, has alleged a violation of clearly established rights under the Impairment of Contracts Clause of which reasonable officials charged with administering retirement benefits would have known.13

_____

12. The court explained that benefit forfeiture provisions are powerless to
deter official misconduct that occurred before their enactment. See 461 A.2d at 598. The misconduct leading to Larsen's removal occurred well before the 1993 adoption of the amended section 16, bringing this case squarely within the rationale of Zimmerman's holding that the public interest in enforcing benefit forfeiture provisions did not outweigh the constitutional interests in protecting vested contractual rights to retirement benefits against retroactive impairment.

13. Appellants also contend that they are entitled to qualified immunity because it was not clearly established that retirement medical benefits were to be treated in the same manner as other forms of retirement benefits. See br. at 11–12. We reject this contention. It was clearly established that "the nature of retirement provisions . . . is that of deferred compensation for services actually rendered in the past." Zimmerman, 469 A.2d at 142–43 (citations omitted). Retirement medical benefits, like other retirement benefits, are an item of economic value offered in return for work performed, and thus fall squarely within the principles set forth in the cases discussed above. Indeed, to accept appellants' argument we would have to close our eyes to what we know in this era of high medical costs, that medical benefits are of crucial importance to retired employees. Moreover, while the Pennsylvania Supreme Court had not applied this rule in the precise context of medical benefits, it had indicated in dictum that it would do so. See, e.g.,
In re Upper Providence Police Delaware County Lodge No. 27, 526 A.2d 315, 322 n.6 (Pa. 1987) (citing deferred compensation cases for the proposition that denial of medical benefits would"pose serious constitutional problems"); Lower Merion Fraternal Order of Police Lodge v.

17

We hold, therefore, that appellants are not entitled to qualified immunity as to Larsen's claim that their termination of his medical benefits unconstitutionally impaired his contractual right to those benefits.

C. Due Process

The Due Process Clause provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, S 1. Larsen claims that appellants violated his due process rights by terminating his medical benefits as they did so without providing him notice and either a pre- or post- revocation hearing. Br. at 22. Appellants answer that, because Larsen had no clearly established property interest in medical benefits for retired members of the judiciary, their

_____

Lower Merion Township, 512 A.2d 612, 619 (Pa. 1986) (noting that three justices of equally divided court would treat medical benefits like any other form of deferred compensation while three justices would resolve case on grounds that did not implicate the issue). Thus, despite the lack of a precedent "directly on point," the law was sufficiently clearly established that a reasonable official would have known that an action that was unlawful as to other forms of retirement benefits also would be unlawful as to retirement medical benefits. See Acierno, 40 F.3d at 620.

In holding that retroactive application of a provision adopted after vesting violates rights of which a reasonable official charged with administering retirement benefits would have known, we recognize that Larsen alleges that both Supreme Court justices and court administrators participated in the decision to deny his benefits. Although, under certain circumstances, a reasonable judicial officer might be held to more stringent standards than a reasonable court administrator, the cases proscribing retroactive divestment of vested rights are sufficiently clear that any reasonable official, whether judicial or administrative, charged with administering a retirement benefits program should have known of this proscription. We also recognize that the judicial officers and court administrators may have played different roles in the decision to deny Larsen's benefits. However, at this juncture, the pleadings do not elucidate the nature of each appellant's participation in the challenged decision. Accordingly, we address only the principles of law of which reasonable officials in any of the appellants' positions should have known in participating in a decision to deny vested benefits.

18

cancellation of Larsen's benefits did not violate clearly established rights under the Due Process Clause of which a reasonable official would have known. Appellants, however, do not deny that if Larsen had a property interest in his medical benefits he was entitled to some sort of hearing with respect to their termination. See, e.g., McDaniels v. Flick, 59 F.3d 446, 453-61 (3d Cir. 1995).

For the purposes of the Due Process Clause, property interests are defined by state law. See Board of Regents v. Roth, 408 U.S. 564, 569, 577, 92 S.Ct. 2701, 2709 (1972); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997). Larsen contends that he had a clearly established property right to the benefits associated with his office, since he had a contractual right to those benefits, and it was "clearly established that contractual rights are property interests under the Due Process Clause of the Fourteenth Amendment." Br. at 22. We find merit in this argument because it is clear that a contract right is a "form of property." United States Trust Co., 431 U.S. at 19 n.16, 97 S.Ct. at 1516 n.16. Thus, inasmuch as "in Pennsylvania . . . the nature of retirement provisions for public employees is that of deferred compensation for services actually rendered in the past," Zimmerman, 461 A.2d 597, Larsen had a property interest in his right to medical benefits that was sufficiently clear that appellants should have understood that the termination of those benefits triggered Larsen's right under the Due Process Clause to an opportunity to be heard regarding his claim of entitlement to those benefits. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.14

_____

14. Appellants contend that since the Pennsylvania Supreme Court had held that elected public officials have no constitutionally protected property interest in their elected public office, see In re 1991 Pennsylvania Legislative Reapportionment Comm'n, 609 A.2d 132 (Pa. 1992), it was reasonable for them to infer that there was no constitutionally protected right to the benefits associated with that public office. Br. at 15. We disagree. A holding than an elected official does not have a property right in his office is completely distinguishable from the situation at hand which involves deferred compensation for services rendered.

Appellants contend that even if Larsen had a clearly established property interest in his medical benefits "a reasonable state official would be justified in concluding that Larsen received all the process to which he was entitled before the cancellation of his health care benefits." Br. at 15–16. Specifically, appellants argue that Larsen had ample opportunity to challenge his impeachment in the Senate, his criminal conviction in the state courts, and his suspension by the Court of Judicial Discipline. Id. at 15. We reject this argument because, while these proceedings allowed Larsen to contest the basis for his suspension and removal from office, none of them afforded him an opportunity to address the distinct issue of whether medical benefits lawfully could be terminated as a result of that suspension and removal. Since Larsen was not afforded an opportunity to be heard regarding the propriety of terminating his medical benefits, reasonable officials could not have believed that Larsen received the process he was due in connection with a deprivation of a clearly established property right. Accordingly, appellants are not entitled to qualified immunity with respect to Larsen's due process claim.15

D. Equal Protection

Appellants contend that they are entitled to qualified immunity as to Larsen's claim that the denial of his medical benefits violated his rights under the Equal Protection Clause, which provides that "[n]o state shall. . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, S 1. We agree. Larsen asserts that he was denied equal protection of the law because he was denied retirement benefits following his removal from office, whereas judges who had been removed for misconduct in the past had received such benefits notwithstanding their removal. Since Larsen does not allege that appellants violated a fundamental right or relied on a

_____

15. We do not find it necessary to address the question of what opportunity to be heard should have been afforded Larsen as appellants offered him no such opportunity at all either before or after Frankforter's
June 17, 1994 letter.

20

suspect or quasi-suspect classification, their actions, in order to comport with the Equal Protection Clause, need have only a rational relationship to a legitimate state interest. See Tolchin v. Supreme Court of New Jersey, 111 F.3d 1099, 1113 (3d Cir.), cert. denied, 118 S.Ct. 435 (1997); Dyszel v. Marks, 6 F.3d 116, 125 (3d Cir. 1993).16

According to appellants, reasonable officials could believe that they had a rational basis for treating Larsen differently from judges removed in the past, since there had been an intervening constitutional amendment which served the rational and legitimate objective of preventing"officials who have been removed from office for breaching the public's trust from benefitting from the . . . public purse." Br. at 17. We agree and in fact are satisfied that Larsen's equal protection claim does not adequately allege a violation of a constitutional right at all and thus does not satisfy the first prong of the Siegert test. See 500 U.S. at 232, 111 S.Ct. at 1793. The Equal Protection Clause does not require identical treatment of all individuals, but rather permits differential treatment of individuals who are differently situated in some relevant respect. See Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331 (1992). Thus, individuals who are differently situated in terms of their "legitimate expectation and reliance interests" rationally may be subjected to different rules designed to afford greater protection to those with heightened legitimate expectations. Id. at 13 (citations omitted) (upholding imposition of greater tax burden on those who acquired property after change in tax law based on their lesser expectation interests as compared to those who owned property before change in law). Because Larsen was removed from office at a time when the Pennsylvania Constitution provided for denial of benefits upon removal, his position was different from that of judges who were removed when no such provision existed.17  Accordingly,

_____

16. Suspect classifications involve traits such as race, national origin, or
alienage, while quasi-suspect classifications involve traits such as
gender. See Dyszel, 6 F.3d 125 n.13.

17. The difference in the law at the time of removal creates a distinction
which a reasonable official could believe was a rational basis, under the

21

there was a rational basis for treating Larsen differently from judges removed from office before the 1993 constitutional amendment, and appellants are entitled to dismissal of Larsen's equal protection claim.

## E. First Amendment

Larsen contends that appellants' revocation of his benefits violated his right of free speech under the First Amendment because it was a form of retaliation for his protected speech in alleging misconduct on the part of his fellow Supreme Court justices. To state a claim for actionable retaliation under the First Amendment, the plaintiff must allege facts which, if proven, would establish that the plaintiff 's protected First Amendment activity was a "substantial or motivating factor in the alleged retaliatory action." Feldman v. Philadelphia Hous. Auth. , 43 F.3d 823, 829 (3d Cir. 1994). This rule is derived from the Supreme Court's opinion in Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977).

In support of their assertion that they are entitled to qualified immunity as to Larsen's First Amendment claim, appellants contend, br. at 18-19, that they could have

_____

Equal Protection Clause, for treating Larsen differently from the judges removed before 1993, thus entitling appellants to qualified immunity under the second prong of the Siegert analysis even if Larsen's allegations satisfied the first prong. While a reasonable official could believe that the 1993 constitutional amendment created a distinction between different judges depending on their status at the time of its adoption, which provided a "rational basis" for differential treatment within the meaning of the equal protection jurisprudence, as discussed in Part III. B 2, supra, a reasonable official could not believe that the 1993 amendment may be applied retroactively to deny previously vested rights, as the impairment of contracts jurisprudence clearly proscribes such retroactive impairments. Because of the divergent standards under these distinct constitutional provisions, we find that reasonable officials
could believe that the decision to deny Larsen's benefits did not violate clearly established equal protection principles but could not believe that this decision did not violate clearly established impairment of contracts principles.

22

believed that their decision to revoke Larsen's benefits was not unconstitutionally retaliatory because they could have believed that they were required to apply the 1993 version of section 16, and thus that they would not be liable under the First Amendment as they would have reached the same decision " `even in the absence of the protected conduct.' " Givhan v. Eastern Line Consol. Sch. Dist., 439 U.S. 410, 416, 99 S.Ct. 693, 697 (1979) (quoting Mount Healthy v. Doyle, 429 U.S. at 287, 97 S.Ct. at 576). Appellants' argument requires the court to apply the objective reasonableness standards of the qualified immunity doctrine to the subjective element of a First Amendment retaliation claim, and thus calls for the somewhat illogical inquiry into "whether a person reasonably could have thought that he in fact thought something." Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir. 1996).

The qualified immunity analysis requires a determination as to whether reasonable officials could believe that their conduct was not unlawful even if it was in fact unlawful. See In re City of Philadelphia Litig., 49 F.3d at 961 n.14. In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory. Even assuming that this could be demonstrated under a certain set of facts, it is an inquiry that cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations, and thus cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to adduce evidence in support of the allegations that the true motive for the conduct was retaliation rather than the legitimate reason proffered by the defendants. See Sheppard, 94 F.3d at 828-29.18

_____

18. In this respect the qualified immunity analysis as to a First Amendment retaliation claim differs from the qualified immunity analysis as to claims under the Impairment of Contracts or Due Process Clause, which requires only an objective analysis of whether reasonable officials could believe that the challenged actions conformed to objective standards of conduct.

23

According to Larsen's allegations, which we must accept as true for purposes of this appeal from an order entered on the pleadings, the true motive for appellants' decision was retaliation for his protected speech. See app. at 72-73; 96-97. Appellants may be able to establish by the end of discovery that their decision in fact rested on a good faith belief, which they would have formed even in the absence of any protected speech, that they were to required to revoke Larsen's benefits under the 1993 version of section 16. However, at this juncture, we must accept Larsen's allegations that their true reasons were retaliatory, allegations which state a claim for violation of clearly established rights under the First Amendment, precluding dismissal on qualified immunity grounds. See Walker v. Schwalbe, 112 F.3d 1127, 1133 (11th Cir. 1997) (rejecting assertion of qualified immunity on grounds that defendants' proffer of non-retaliatory reason created factual dispute as to "true reason" for the adverse action and did not defeat claim for violation of clearly established right against retaliatory action); see also Azzaro v. County of Allegheny, 110 F.3d 968, 981 (3d Cir. 1997) (holding that assertion of non-retaliatory reason which would have justified decision even in absence of protected activity created factual issue precluding summary judgment as to retaliation claim).

In reaching this result we are not suggesting that a bare allegation of retaliatory motive necessarily is sufficient to defeat an assertion of qualified immunity as to a retaliation claim. In some circumstances, the legitimate basis for the actions might be so apparent that the plaintiff 's allegations of retaliatory motive could not alter the conclusion that under the circumstances alleged in the pleadings, the defendants would have been compelled to reach the same decision even without regard for the protected First Amendment activity. In this case, however, appellants were faced with a decision as to whether to subject Larsen to the more adverse 1993 version of section 16, a decision whose outcome, under the circumstances alleged by Larsen, could have been affected by a retaliatory motive.19 Thus we

_____

19. To defeat a First Amendment retaliation claim if a plaintiff demonstrates that his protected First Amendment activity was a

cannot conclude from the face of the pleadings that appellants would have taken the same action in the absence of protected speech. Accordingly, appellants are not entitled, at this preliminary stage of the litigation, to qualified immunity as to Larsen's First Amendment retaliation claim.

F. Public Health Services Act

Appellants contend that they are entitled to qualified immunity as to Larsen's claim that the termination of his benefits violated his rights under the Public Health Services Act, 42 U.S.C. SS 300bb–1 et seq. ("PHSA"). The PHSA provides that state-operated group health plans must offer 18 months of continuing coverage to qualified beneficiaries who otherwise would lose coverage as a result of a "qualifying event." 42 U.S.C. SS 300bb–1(a), 300bb–2(2). The PHSA defines the term "qualifying event" to include "termination (other than by reason of [the] employee's gross misconduct)." Section 300bb–3(2).

Appellants contend that Larsen did not have a clearly established right to continuing coverage under the PHSA, because reasonable officials could believe that Larsen's termination was not a "qualifying event" within the meaning of the PHSA entitling him to elect continuing coverage. According to appellants, reasonable officials could conclude that Larsen's termination was "by reason of . . . gross misconduct," thus excluding his termination from the definition of a "qualifying event" under section 300bb–3(2), and rendering him ineligible for coverage under section

_____

substantial or motivating factor for the retaliatory action, a defendant must establish not merely that he "could properly" have taken the same adverse action based on an independent "legally sufficient" reason, but also that he "would have" done so in the absence of protected conduct. Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1075 (3d Cir. 1990). The mere fact that the 1993 version of section 16 provided for termination of benefits upon removal would not defeat Larsen's retaliation claim if he could demonstrate that appellants decided to apply that provision, rather than the more lenient version of section 16 that existed at the time of vesting, due to retaliatory animus.

300bb-1(a). In support of their argument that Larsen's termination reasonably could be viewed as a termination "by reason of . . . gross misconduct," appellants emphasize that Larsen had been convicted of two felony counts, removed from office by the Court of Common Pleas as part of his criminal sentence, suspended from office by the Court of Judicial Discipline for his criminal conduct which that court found had undermined public confidence in the judiciary, and called before the Senate on a writ of impeachment summons. Br. at 20-21.

Neither the PHSA, nor the comparable statute applicable to private employers, defines the term "gross misconduct." See 42 U.S.C. SS 300bb-1 et seq.; 29 U.S.C. SS 1161 et seq.20 Moreover, as of the time appellants decided to terminate Larsen's benefits, the cases construing these provisions had not set forth a clear definition of "gross misconduct" under the PHSA.21 These cases, however, had applied the standard to conduct which reasonable officials could believe was no more egregious than Larsen's conduct in unlawfully procuring controlled substances through the use of his subordinates. See, e.g., Burke v. American Stores Employee Benefit Plan, 818 F. Supp. 1131 (N.D. Ill. 1993) (holding that use of improperly procured promotional discount vouchers to obtain free products from employer's retail outlets constituted gross misconduct); Adkins v. United Int'l Investigative Servs., Inc., 1993 WL 345186 (N.D. Cal. 1993) (holding that leaving post unattended and falsifying records to receive additional paychecks constituted gross misconduct); Conery v. Bath Assocs., 803 F. Supp. 1388, 1396 (N.D. Ind. 1992) (holding that misappropriation of

_____

20. The analogous provision governing private employers is set forth in the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. S 1161(a), which requires the employer to offer continuing coverage to employees who otherwise "would lose coverage under the plan as a result of a qualifying event."

21. In Burke v. American Stores Employee Benefit Plan, 818 F. Supp. 1131, 1135 (N.D. Ill. 1993), the court, applying 29 U.S.C. S 1161(a), noted that, "[t]here is little direct statutory or judicial guidance on the meaning of `gross misconduct.' " While the Burke court looked to Illinois state law for guidance, we have not made any comparable state-law analysis.

26

funds constituted gross misconduct). We are satisfied from these cases and from the language of the PHSA that Larsen has not adequately alleged a violation of the PHSA and thus his complaint with respect to that statute does not pass muster under the first prong of a Siegert analysis. Moreover, even if it did, because a reasonable official could believe that the acts which resulted in Larsen's termination amounted to gross misconduct, it was not clearly established that Larsen's termination was a "qualifying event" triggering his right to coverage under the PHSA.

Larsen contends that, regardless of the egregiousness of his conduct, it cannot be characterized as "gross misconduct" under the PHSA because it did not occur "within the scope of his employment as an associate justice." Br. at 26-27. However, nothing in the statutory language or relevant case law clearly establishes, or even suggests, that "gross misconduct" under the PHSA must occur within the scope of employment. Accordingly, it appears that a reasonable official applying the plain language of the PHSA could conclude that any termination which occurred "by reason of [the] employee's gross misconduct" would fall within the exception to section 300bb-3(2) and thus would not constitute a "qualifying event" entitling the employee to continuing coverage, regardless of whether the conduct occurred within the scope of employment.22 Because Larsen did not adequately allege a violation of the PHSA and because, therefore, there was no clearly established law indicating that Larsen's termination was a qualifying event under section 300bb-3(2), appellants are entitled to qualified immunity as to Larsen's claim under the PHSA.

_____

22. Even if it were clearly established that"gross misconduct" encompassed only misconduct within the scope of employment, a reasonable official could believe that Larsen's conduct was sufficiently related to his employment to satisfy such a requirement. As the district court noted, 955 F. Supp. at 1581 & n.33, the criminal misconduct which led to Larsen's removal from office involved Larsen's use of his subordinates and his state employees' prescription plan to procure prescription medications unlawfully. Absent some authority to the contrary, reasonable officials could conclude that this nexus between Larsen's misconduct and his employment would satisfy any requirement in that regard.

27

IV. CONCLUSION

For the foregoing reasons, we hold that Larsen's complaint alleges violations of clearly established rights under the Impairment of Contracts Clause, the Due Process Clause, and the First Amendment. Therefore, appellants are not entitled to qualified immunity with respect to those claims and, accordingly, we will affirm the district court's denial of their motion to dismiss those claims on qualified immunity grounds. However, Larsen's complaint fails to allege violations of his rights under the Equal Protection Clause or the Public Health Services Act. We therefore will reverse the denial of appellants' motion to dismiss those claims and on remand the district court should dismiss those claims on qualified immunity grounds. In summary, we will affirm in part, will reverse in part, and will remand this case to the district court for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

28