Minister Michael Malik
ALLAH, Plaintiff,

v.

Humza AL–HAFEEZ, et
al., Defendants.

No. CIV.A. 96–6587.

United States District Court,
E.D. Pennsylvania.

June 24, 2002.

Michael Malik Allah, S.C.I. Greene, Waynesburg, PA, pro se.

Khalil Wali Muhammad, S.C.I. Somerset, Somerset, PA, pro se.

Thomas S. Bloom, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for plaintiff.

Sue Ann Unger, Denise A. Kuhn, Office of Attorney General, Phila, PA, for defendants.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Plaintiff Michael Malik Allah brings the above-titled action alleging a violation of 42 U.S.C. § 1983. Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion is granted.

### I. Background

Allah, an inmate with *in forma pauperis* status, initially filed this *pro se* complaint on October 15, 1996, alleging that William Ennis, administrative chaplain for the State Correctional Institution at Frackville (SCIF), and Humza Al–Hafeez, contract chaplain for the Nation of Islam (NOI) within SCIF, violated his First Amendment right to free exercise of religion. Specifically, Allah claimed that his rights, along with the rights of other inmates, were violated because Al–Hafeez is not a member of the (NOI) and engages in teachings that contradict the teachings of Elijah Muhammad, the leader of the Nation of Islam. In 1997, Allah added twenty-six prison officials and correctional officers as defendants alleging retaliation claims for filing the lawsuit and attempting to practice his religion. Also named as plaintiffs in this action were Rabiq V. Muhammad and Khalil Wali Muhammad. After Rabiq Muhammad moved to withdraw

as plaintiff, this court granted his motion on July 29, 1997. On April 22, 1998, this court dismissed the complaint, and the now counseled Allah[1] alone appealed. The Third Circuit found that the plaintiff's claim for punitive and nominal damages were not barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e). On remand, this court allowed plaintiff to amend his complaint. Plaintiff filed his amended complaint on September 6, 2001.

Count One of the amended complaint alleges that SCIF Superintendent Joseph Chesney, as well as Ennis and Al–Hafeez, and Corrections Officer Sergeant Andrew Kalinowski violated Allah's right to free exercise at SCIF. According to the plaintiff, defendants substantially burdened and violated this right by excluding him from religious services, preventing him from following the religious dietary laws associated with the Muslim holy period Ramadan, and denying him religious counseling that conformed to the teachings of Elijah Muhammad, the founder of the NOI. Count Two alleges that Chesney, Hearing Examiner J. Kevin Kane and Corrections Officers Patrick Reedy, Donald Betz, Joseph Hannon, Dean Harner, Scott Allen and Michael Gaudreau retaliated against Allah for filing grievances and lawsuits asserting his First Amendment rights. Count Three alleges that Property Sergeant Kraynak violated Allah's due process rights by destroying his personal property prior to the final determination of a grievance. Plaintiff seeks nominal and punitive damages as to Counts One and Two, and nominal, compensatory, and punitive damages in Count Three. Plaintiff also seeks declaratory relief in all counts. The corrections officers assert affirmative defenses, including qualified immunity and plaintiff's failure to exhaust administrative remedies.

---

**1.** The court acknowledges with appreciation the able pro bono representation of the plaintiff by the law firm of Schnader, Harrison, Segal & Lewis.

The relevant facts viewed in the light most favorable to the plaintiff are as follows.

## A. Free Exercise Claim

Allah resided at SCIF from July 1996 until July 1997 when he was transferred to the State Correctional Institution at Greene. Allah identifies his religion as, alternatively, Mohammad's Temple of Islam, Lost and Found Nation of Islam, Nation of Islam, and New Islam. Allah Dep. at 73–77, 101; ex. 51 at 2.[2] Plaintiff believes in one god, Allah, who is Master Fard Muhammad, and his messenger Elijah Muhammad. Accordingly, the plaintiff follows the original teachings of Elijah Muhammad, the restrictive laws of Islam, and related laws of Muslim Behavior and Manners. Allah Dep. at 183, 186. Allah's faith group is organized hierarchically providing for a minister, captains, lieutenants, squad leaders and common soldiers. *Id.* at 80, 94. Allah considers himself a minister within the prison, nominated by a fellow inmate. *Id.* at 93. While the NOI is an umbrella organization with many different factions following the teachings of Elijah Muhammad, Allah believes that it may be possible for the different groups within the NOI to worship together. *Id.* at 87. However, Allah notes that some differences may make it impossible for different factions to worship together. *Id.*

The Pennsylvania Department of Corrections recognized the NOI faith group after several inmates, including Allah, sued the department. *See Allah v. Menei*, 844 F.Supp. 1056 (E.D.Pa.1994). SCIF began the process of accommodating the NOI after a 1994 lawsuit brought by Dauntel Evans, an SCIF inmate. *See Evans v. Chesney*, 94–cv–6115 (E.D.Pa.). Evans submitted Al–Hafeez's name to the administration and supported his appointment as contract chaplain. Ex. 11. Beginning in July 1995, Al–Hafeez conducted worship services for the NOI inmates, counseled inmates individually, as well as visited the NOI followers in the restrictive housing unit. Al–Hafeez Dep. at 47, 57, 61–65.

The current lawsuit arises out of events that occurred in the fall of 1996. After Allah transferred to SCIF, he began attending the NOI worship services led by Al–Hafeez.[3] On September 11, 1996, Al–Hafeez addressed Allah as "Wilson," Allah's name on the minister's call sheet. Allah Dep. at 48–49, 61. Allah interrupted Al–Hafeez to object to the use of his "slave name," and the two had a disagreement. Allah Dep. at 138, 151–52. Al–Hafeez then asked Allah to leave the religious gathering, and Allah complied. *Id.* at 151–52. Following this incident, corrections officer Sergeant Andrew Kalinowski informed Allah that he could no longer attend NOI services. Kalinowski Dep. at 39, 49–50. On September 18, 1996, Al–Hafeez wrote to Deputy Superintendent Shannon, a non-defendant, explaining that Allah had been suspended from attending the NOI religious services until further notice. Ex. 19 at 25–26. Deputy Shannon forwarded this memo to security officials on Allah's cell block where it was posted. Ex. 58 (Chesney Decl.), Kalinowski Dep. at 47–48. Allah initially grieved his suspension on September 19, 1996. Ex. 21 at 1. The grievance was denied for not following proper procedure. Ex. 21 at 2. Allah forwarded the grievance to Deputy Superintendent Shannon and Superintendent

---

**2.** All depositions are attached to defendants' motion for summary judgment as exhibits volume one unless otherwise specified. All exhibits are those attached to defendant's motion for summary judgement as exhibits volume two unless otherwise specified.

**3.** NOI services begin with a study discussion. Allah Dep. at 205. Following the discussion, NOI members conduct a temple service. *Id.*

Chesney. Pl.'s ex. 7, 8. However, Shannon returned the request to Allah noting that it was inappropriate to address a grievance directly to him. Pl.'s ex. 7. Chesney does not recall receiving the grievance. Chesney Dep. at 18–19.

On September 22, 1996, Al–Hafeez sent a daily incident report to Program Manager Searfross, a non-defendant, that stated,

I am not barring Michael Wilson (Allah) from the meetings. He is welcome to attend Services of the NOI as long as he is able to conduct himself in accordance with our rules during Services.... Mr. Michael Wilson seems to have a different understanding of the Teachings of the Honorable Elijah Muhammad, than I am teaching.... I think that Michael Wilson should be suspended from Chapel Service on Wednesday until he decides that this is the Service that he wants to attend. And that he is able to conduct himself in a manner that will not disrupt our Service.

Ex. 20. However, Allah did not return to NOI religious services. While Allah was suspended from services, he submitted a plan of action for an alternative NOI faith group to Reverend Ennis. Ex. 24. However, Al–Hafeez reacted negatively to Allah's plan of action and warned Ennis that "[t]o continue to meet with Michael Wilson on Religious matters, is to give him a sense of the kind of importance, among the inmates that is not warranted." Ex. 24. On October 9, 1996, Allah once again filed a grievance challenging his suspension. Ex. 21 at 3. In the grievance, Allah wrote that the reverends "are the enemy of the BLACK PEOPLE" and noted that the "devils" were trying to control his religion. Ex. 21 at 3. Grievance coordinator Forr returned the grievance with a form letter informing Allah that "[a]ll grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner." Ex. 21 at 4. Forr wrote on the memo "[r]e-word your grievance and I will process it." *Id.* After the grievance was returned, Allah forwarded the grievance to Shannon as well as Chesney. Pl.'s ex. 7, 8. In late October, 1996, Inmate Program Manager Searfoss sent a memo to the unit manager on Allah's cell block stating that Allah was allowed to attend the NOI services. Searfoss cautioned that Allah "not attempt to disrupt or cause any problems at these services." Ex. 22. Although the memo indicates that Searfoss sent the memo to the unit officers in Allah's cell block as well as Al–Hafeez, *id.,* Kalinowski claims he did not see the memo. Kalinowski Dep. at 45, 48. On November 12, 1996, Plaintiff was placed in the Restricted Housing Unit (RHU). Kalinowski did not work the one NOI religious service day following the Searfoss memo informing the corrections officers that Allah could attend services. Ex. 55.

While Allah was grieving his suspension, he also filed a grievance challenging prison policy preventing NOI followers from exercising together in the Yard. Ex. 23. Noting that other inmates were allowed to play football and cards as well as other group activities, Allah wrote that prison officials discriminated against NOI followers by denying them the right to run and do calisthenics. *Id.* In response to this grievance, a non-defendant grievance officer wrote "[g]roup activity is prohibited anywhere within the institution, unless the Superintendent authorizes this activity in writing." Ex. 23 at 2.

In December, the NOI followers observed Ramadan. Prior to this holy period, both Al–Hafeez and Allah submitted Ramadan action plans. Ex. 26. Al–Hafeez's action plan called for one meal a day to be eaten after dark, although breakfast could be served before dawn for those who

needed an additional meal. *Id.* at 1. Al–Hafeez noted that "[n]o land meat or fowl may be eaten during this period" and that group prayer before · or after meals was not required. *Id.* Allah's action plan forbid the consumption of any meat—including poultry—and allowed for an optional breakfast meal. In contrast to Al–Hafeez's plan, Allah's request stated that NOI followers must break their fast in "a single brotherly gathering" and must gather for group prayer. Ex. 26 at 4. Both Al–Hafeez's and Allah's requests discussed the NOI prohibition against meat and poultry; however, neither action plan listed other restrictions. The DOC central office sent SCIF instructions regarding the fast prior to Ramadan. Ex. 26 at 5, 8–22. During Ramadan, Allah participated in the fast and consumed only one meal per day. While he accepted breakfasts, he saved the food for dinner in case the prison served prohibited food. Allah Dep. at 118. According to Allah, the prison did not properly prepare his Ramadan meals and he was forced to consume prohibited food.[4] On December 8, 1996, Allah filed a grievance stating that he was being fed prohibited food such as peanut butter, kidney beans, and lima beans. Ex. 26 at 23. A non-defendant grievance officer responded the NOI menu for Ramadan is specified by the DOC and SCIF followed that menu. Ex. 26 at 24.

On March 2, 1997, prison security discovered a letter from Allah to a minister outside the prison. Allah called Al–Hafeez a hypocrite and added:

> He is clearly a conflict of interest for the Black Muslims. On one hand he say he is a Black Muslim and on the other hand, he is agreeing with the Attorney General Office to testify against the Messenger followings saying we don't need this, that and the other. He is going to Die just like Malcolm.

Ex. 43 at 8. In a memo dated May 30, 1997, Security Captain Dennis P. Durant informed Deputy Superintendent Shannon that Allah was place in administrative custody in the restrictive housing unit beginning May 19, 1997, pending a "Separation Transfer" from Al–Hafeez and other NOI inmates. Durant wrote,

> [t]he Security Office is requesting a Separation Transfer be initiated on Inmate Wilson from Minister Humza Al–Hafeez and the inmates listed above to prevent any type of Institutional unrest between the different factions of the NOI Inmates that support Minister Al–Hafeez and those supporting Inmate Wilson at SCI Frackville.

Ex. 45.

On the same day he was placed in administrative custody, May 19, 1997, Allah submitted a request for religious services to Deputy Superintendent Shannon. Specifically, Allah desired the establishment of a separate Temple of Islam distinct from Al–Hafeez's led faith group. Ex. 51 at 5. In his request, Allah stated that the existing faith groups at SCIF failed to meet his religious needs. *Id.* According to Allah, his faith group's customs and practices differed significantly from Al–Hafeez's beliefs. *Id.* Shannon responded that he did not oversee religious affairs, noted that Allah had already filed the present lawsuit, and directed Allah to submit future requests to grievance officer Forr. *Id.*

### B. Retaliation Claim

Allah claims that defendants engaged in numerous acts of retaliation such as is-

---

4. According to the teachings of Elijah Muhammad, NOI followers may not eat certain beans or vegetables. Elijah Muhammad, *How to Eat to Live* (1972). Plaintiff claims that his Ramadan meals included peanut butter, kidney beans, and lima beans—all prohibited food. *See* pl.'s ex. 13.

suing baseless misconduct reports and obstructing Allah's efforts to practice his religion. The first misconduct report occurred on November 12, 1996, following a dispute regarding phone use. Allah alleges that he notified defendant Reedy that he had a previously scheduled legal phone call at 2:45 p.m. that day. Allah. Dep. at 12. Officer Reedy informed Allah that his phone call had been scheduled for the previous day. *Id.* Allah disagreed and asked to speak with the unit manager. In his misconduct report, Defendant Officer Betz noted that Allah began yelling and cursing as the other inmates returned from the Yard. Ex. 5 at 1. Officer Betz charged the plaintiff with refusing to obey an order and threatening another person. Ex. 5 at 2. Even though Allah denied using profanity, the hearing officer, Defendant Kane, found that a misconduct charge was warranted. *Id.*

Allah's second misconduct charge occurred on February 6, 1997, in the library. Allah Dep. at 27. Allah left the library without signing out and entered the lavatory. *Id.* at 29. Defendant Officer Hannon followed Allah into the restroom and ordered Allah to sign out of the library. *Id.* Allah claims that he was rushing out of the restroom when his zipper became stuck. *Id.* at 30. Fearing a misconduct charge for failing to follow orders, Allah left the bathroom without fixing his zipper. *Id.* When Allah reentered the library, he turned his back to everyone and repaired his zipper *Id.*

Officer Hannon then asked Allah to exit the library with him. *Id.* at 31. Hannon accused the plaintiff of playing with his zipper in front of the female librarian. *Id.* Allah responded that his zipper was stuck, that he was not a pervert, and that he did not find white women appealing. *Id.* Officer Hannon issued a misconduct charge alleging that Allah refused to obey his

order to keep his voice down and used abusive and obscene language when referring to the librarian. Pl.'s ex. 16. The hearing officer, defendant Kane, initially found Allah guilty of misconduct. Ex. 6 at 3. However, the Program Review Committee vacated the decision due to procedural error. Pl.'s ex. 19. On remand, defendant Kane found that Allah was not guilty of the alleged misconduct. *Id.*

On the same day as the zipper incident, Officers Harner and Allen delivered the misconduct charge to Allah's cell. Allah Dep. at 37. While Allah was reviewing the charge, Officer Allen returned with Officer Gaudreau to inspect Allah's cell. Allah Dep. at 43. Later that evening, prison guards came to Allah's cell, handcuffed him, and transported him to the Restrictive Housing Unit. *Id.* Gaudreau issued another misconduct charge against Allah alleging that Allah threatened Gaudreau and Allen with bodily harm and used abusive or obscene language. Pl.'s ex. 20. Hearing Officer Kane found Allah guilty of the misconduct charge. Ex. 7 at 1. Allah appealed this decision and the Program Review Committee affirmed. Ex. 7 at 8. Allah then appealed to the Superintendent and the Central Office Review Committee raising his retaliation claim for the first time. Ex. 7 at 13, 15. Allah's appeals were denied. Ex. 7 at 9.

### C. Due Process

On or about July 2, 1996, Allah transferred to SCIF and arrived with items of personal property approved by prison officials. Allah Dep. at 61–62. On November 18, 1996, Defendant Property Sergeant Kraynak inventoried Allah's property due to the inmate's assignment to the RHU. Kraynak Dep. at 14. Kraynak confiscated four shirts, two sweat shirts, one pair of shorts, and a mirror, valued at around $100.00. Pl.'s ex. 21. Kraynak confiscated the mirror because Allah already owned a

mirror and the second mirror was larger than allowed. Kraynak Dep. at 15. Kraynak seized the clothing because the colors were not permitted either in the general prison population or for inmates with Allah's custody level. Kraynak Dep. at 16–20; ex. 3. Kraynak informed Allah that he had 30 days to pay to have the confiscated materials mailed out of the prison or Kraynak would destroy them. Kraynak Dep. at 22. Allah told Kraynak that he would grieve the confiscation. On the confiscation slip, Kraynak wrote "refused." Ex. 9 at 2.

Allah filed a grievance contesting the confiscation and requesting an explanation as to why the items were confiscated. Pl.'s ex. 22. On December 10, 1996, the grievance officer, non-defendant Lt. Novitsky informed Allah, "[a]ll items which you were directed to either send home or destroy are currently being held in Property Storage. In keeping with [prison regulations], these items must be sent home or destroyed. Property Storage will only hold these items for a 30 day period. Submit proper cash slips to Property Sergeant for these items to be shipped out." Ex. 9 at 4. Allah appealed this decision to the superintendent. Ex. 9 at 5. Chesney denied Allah's appeal on December 30, 1996, explaining that the confiscated items were not allowed because of their color and Allah's program level. Ex. 9 at 10. Chesney wrote, "[i]t seems the decision on the disposition of these items is now yours." Ex. 9 at 10. In early January 1997, Allah notified Chesney of his appeal to the De-

partment of Corrections Central Office (CORC). Ex. 9 at 20. The CORC requested the grievance documentation, which was mailed to it on January 14, 1997. Ex. 9 at 21. In March, Allah sent a grievance to Forr including CORC's failure to respond to his appeal. Ex. 9 at 22. Forr returned the grievance for presenting multiple issues and instructed Allah to write to the CORC. Ex. 9 at 23. Although the appeals process can take up to 68 days from the date of the initial appeal until it is fully resolved before the CORC, see Kraynak Dep. at 33; pl.'s ex. 24, Kraynak destroyed Allah's property April 1, 1997. Kraynak Dep. at 55.

On April 18, 1997, the CORC upheld the grievance decision. Ex. 9 at 24. After the decision, the plaintiff sent a cash slip and request to Kraynak to mail his confiscated property. Ex. 10 at 1. Kraynak responded that the items were already destroyed because Allah had refused to provide an address to mail them. Id. When Allah learned that Kraynak destroyed his property prior to the final disposition of his appeal, he grieved the destruction of his property. Ex. 10 at 2. In response, a prison grievance officer denied Allah's appeal and found that his property was destroyed according to established guidelines. Ex. 10 at 4. The CORC affirmed the grievance officer's decision and dismissed Allah's appeal. Ex. 10 at 8.

## II. Discussion [5]

Prison officials assert the defense of qualified immunity. When such a defense

---

**5.** Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *Id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317,

is raised, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged ...." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Therefore, the court shall first determine whether defendants violated the plaintiff's constitutional rights and then discuss whether they are entitled to qualified immunity.

### A. Free Exercise Claim

■ "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citation, punctuation omitted). However, the Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights ...." *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). In order to balance these opposing concerns, the Supreme Court held in *Turner v. Safley*, 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), that prison regulations burdening constitutional rights are reviewed under a reasonableness standard rather than a heightened scrutiny standard. Therefore, a prison regulation that impinges an inmate's free exercise right is valid only if it is reasonably related to legitimate penological interests. *Id.* at 89, 107 S.Ct. 2254. While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner* 482 U.S.

at 84, 107 S.Ct. 2254, this approach "avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400.

In *Turner*, the Supreme Court directed lower courts to consider four factors when assessing the reasonableness of a prison regulation that burdens an inmate's constitutional rights. As the Third Circuit recently explained:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

*De Hart v. Horn*, 227 F.3d 47, 51 (3d Cir.2000) (internal quotations omitted). While these factors are merely guides in evaluating prison regulations under a single reasonableness standard, "the first factor looms especially large, because it tends to encompass the remaining factors, and

323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996). In response, the nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on

which a jury could reasonably find for the nonmovant. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

some of its criteria are apparently necessary conditions." *Waterman v. Farmer*, 183 F.3d 208, 214 (3d Cir.1999).

*Turner* applies, however, only when an inmate demonstrates that a constitutionally protected interest is at stake. *DeHart v. Horn*, 227 F.3d 47, 49 (3d Cir.2000) (en banc). *Id.* Even though an inmate may allege that prison policy infringes his First Amendment religious rights, "[t]he mere assertion of a religious belief does not automatically trigger First Amendment protection." *Id.* "[O]nly those beliefs which are sincerely held and religious in nature are entitled to constitutional protection." *Id.* For purposes of their motion, defendants do not dispute the sincerity of plaintiff's beliefs. Defs.' Mot. for Summ. J. at 32.

### 1. Exclusion from Religious Services

■ Defendants argue that prison officials excluded Allah from religious services because of the legitimate penological interest in maintaining order and security as well as providing chaplaincy services to other inmates. Under the first prong of the *Turner* balancing test, the governmental interest must be legitimate. Clearly, prison officials have a legitimate interest in maintaining order and security within the prison system. *See Fraise v. Terhune*, 283 F.3d 506, 513 (3d Cir.2002). Recognizing this, plaintiff argues that there is a genuine issue of material fact as to whether Allah's behavior raised a security concern.

According to the plaintiff, there is no valid, rational connection between the defendants proffered objective and Allah's exclusion from religious services.

This court, however, disagrees. When analyzing whether a prison regulation is rationally related to prison security, "a measure of deference is especially appropriate when a regulation implicates prison security." *Fraise*, 283 F.3d at 516. Construing all the evidence in the plaintiff's favor, there is a valid, rational connection between maintaining order and security within the prison and Allah's exclusion from NOI services. While Allah argues that he did not raise his voice or stand up when he interrupted Al–Hafeez during religious services on September 11, 1996, Allah concedes that he challenged Al–Hafeez, Allah Dep. at 138, and that the two had a disagreement about Al–Hafeez's teachings. Allah Dep. at 151–52. In a prison setting, avoiding conflict is critical to maintaining order as well as a safe and secure environment. Therefore, this court finds that Al–Hafeez's request that Allah leave the September 11th service, Al–Hafeez's memo and report prohibiting Allah from NOI services, and the decision of prison official's to prevent Allah from attending services were rationally related to the legitimate government interest of maintaining order and security within the prison system.[6]

6. Plaintiff argues that defendants must do more than merely utter the words "security" and "lack of funds" in order for a court to grant summary judgment in their favor. While the Third Circuit has held that prison officials "may not take shelter" in these "mere words" and must "substantiate the permissibility of their conduct," *Small v. Lehman*, 98 F.3d 762, 768 (3d Cir.1996), the Third Circuit decided *Small* under the more exacting standard of the Religious Freedom and Restoration Act (RFRA), 42 U.S.C. § 2000bb, rather than *Turner's* balancing approach. Under RFRA, the government could substantially burden a person's free exercise only if it was in furtherance of a compelling interest and it was the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1. However, the Supreme Court declared RFRA unconstitutional in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) and, under *Turner*, this court has "additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85, 107 S.Ct. 2254.

Under *Turner's* second factor, "courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *DeHart v. Horn*, 227 F.3d 47, 55 (3d Cir.2000). This court finds that Allah had alternative means of practicing his religion during the time Al–Hafeez and corrections officials excluded him from services. Allah could pray, meditate, and study his religion. Furthermore, Allah could discuss religion with other inmates outside his cell. While prison officials prevented Allah from attending Al–Hafeez's religious services due to a security threat, Allah did retain alternative means of practicing his faith. *See Fraise*, 283 F.3d at 518–19 (finding that *Turner's* second factor weighed in prison officials favor even though prison regulations prevented plaintiffs from studying their religious literature because they could still read the Bible and the Quran).

In evaluating *Turner's* third factor, courts should defer to prison officials when the accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff . . . ." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. As noted earlier, Allah's behavior created a security concern. In order to accommodate Allah's attendance at NOI services and the potential risk for conflict, prison officials would have needed to monitor NOI religious services more closely. The additional strain on prison resources would have affected prison staff and other inmates. Even though prison officials reevaluated Allah's security risk and later determined that Allah could attend services, the court finds that the third factor weighs in the defendants favor.

*Turner's* fourth factor directs courts to assess whether there are alternatives to the regulation that would impose only "de minimus cost to valid penological interests." *Turner*, 482 U.S. at 91, 107 S.Ct. 2254. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* The plaintiff has not identified a ready alternative to the claimed intrusion. The only alternative to plaintiff's exclusion from services would be to provide more security during religious meetings to ensure order. However, reassigning more security to the chapel area greatly impacts other inmates, guards, and prison resources. Therefore, the cost of this alternative is not de minimus.

This court concludes that Allah's two month exclusion from religious services was reasonable in light of security and economic concerns. Therefore, the court finds that Al–Hafeez's [7] request that Allah leave the September 11th service, Al–Hafeez's memo and report prohibiting Allah from NOI services, and the decision of

---

7. Defendants also argue that Al–Hafeez is not a state actor for purposes of section 1983. Two appellate courts have addressed this issue with conflicting results. In *Montano v. Hedgepeth*, the Eighth Circuit held that a full-time, state employed prison chaplain was not a state actor when engaged in inherently ecclesiastical functions such as excommunicating a prisoner and prohibiting the individual from attending religious services. 120 F.3d 844, 851 (8th Cir.1997). However, the Sixth Circuit in *Phelps v. Dunn* held that a volunteer chaplain was a state actor when he prevented a prisoner from giving testimony during a religious service. 965 F.2d 93, 102 (6th Cir.1992). According to the Sixth Circuit, the volunteer chaplain was a state actor because his right to conduct religious services at the prison was a privilege created by the state. *Id.* Because the alleged intrusions were reasonable, the court need not resolve this issue.

prison officials to prevent Allah from attending services did not violate the plaintiff's First Amendment rights.

### 2. Failure to Provide Allah with Minister

■■■ The State does not have an affirmative duty to provide every prisoner with the clergy person or the service of his or her choice. *See Small,* 98 F.3d at 767; *Gittlemacker v. Prasse,* 428 F.2d 1, 4 (3d Cir.1970). Even though the state is not required to provide a chaplain, priest or minister for every faith regardless of size, *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), "an opportunity to worship as a congregation by a substantial number of prisoners may be a basic fundamental exercise of religion by a bona fide religious group."[8] *Small,* 98 F.3d at 767. According to Allah, there are significant differences between his beliefs and Al-Hafeez's beliefs.[9] Therefore, defendants violated Allah's First Amendment rights by failing to hire an NOI minister with appropriate beliefs. Plaintiff claims that a genuine issue of material fact exists as to how many other inmates were in agreement with Allah and desired a separate NOI service.

In response to plaintiff's arguments, defendants claim that prison policy is to "keep at a minimum the number of separate inmate religious groups accommodated within the prisons because past fragmentation has led to security and management concerns, and was perceived to permit or encourage gang activity and inmate leadership which contributed to incidents of unrest at DOC institutions." Ex. 58 at 2 (Chesney Decl.). According to Superintendent Chesney, group activities at SCIF are strictly controlled because they can lead to group action or encourage individual violence affecting the control of the prison. *Id.* Defendants also note that Allah failed to document a proposed group of sufficient number to qualify as a separate faith group and named himself as minister of the new religious organization. Ex. 51 at 11. Defendants argue that if an individual prisoner were allowed to lead a religious service, that would place the inmate in a position of authority. "That power could be used to coerce inmates. This coercion not only affects the potential victims, but also threatens security of the entire institution." Ex. 58 at 2 (Chesney Decl.). Therefore, accommodating plaintiff's request would have

---

**8.** As mentioned earlier, *Small* dealt with the Religious Freedom and Restoration Act which the Supreme Court later ruled unconstitutional in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). However, the Third Circuit's finding in *Small* that communal worship may be a fundamental aspect of religious exercise continues to be good law in the Third Circuit. *Scott v. Horn,* 1998 WL 57671, *6 (E.D.Pa.).

**9.** In his memorandum of law in opposition to defendant's motion for summary judgment, plaintiff describes the differences as follows: [Allah] believes that NOI laws apply equally to free men and those incarcerated. Contrary to this belief, Al-Hafeez believes that NOI laws apply differently to free men and

those incarcerated. [Allah] believes that NOI restrictive rules forbid the use of "slave names." Al-Hafeez does not believe the same and uses both "slave names" as well as Muslim names. [Allah] believes that it is the minister's responsibility to assist inmates with obtaining employment and housing after being released from prison, while Al-Hafeez does not believe the same. On several occasions, Al-Hafeez has actually stated to inmates that "he was not going to teach the old way that Muhammad taught," which is in direct violation of the instructions of the Honorable Elijah Muhammad.
Pl.'s Mem. in Opp'n. to Defs.' Mot. for Summ. J. at 17.

raised extensive security and economic concerns.

The defendants refusal to recognize an alternative NOI faith group or hire another minister was reasonably related to legitimate penological interests. Under *Turner,* there is a rational connection between defendants' denial of plaintiff's request and the prison's policy against fragmentation. As noted above, the state does not have an affirmative duty to provide religious ministers for *all* faiths within a prison. *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Small,* 98 F.3d at 767. In order to fully accommodate Allah's rights, prison officials would be forced to hire another NOI minister as well as arrange for supervision of the additional services. Along with these additional economic costs, it is rational to conclude that allowing an inmate to splinter a religious group raises security concerns. This court also notes that in his initial request, plaintiff did not seek a minister for the Temple of Islam but named himself as its leader. Ex. 51 at 11. Limiting inmate control over group activity is also rationally related to prison officials' interest in maintaining order and security. As discussed above, Allah had alternative means of practicing his religion. The only means of fully accommodating plaintiff's rights would be to conduct another search and hire an additional NOI minister. Even if a minister volunteered his services, the cost of the search is greater than de minimus. Prior to hiring Al–Hafeez, defendants searched for nearly two years in order to find an NOI minister who could come to SCIF for religious services and counseling. Under *Turner's* highly deferential standard, defendants failure to hire a minister or appoint plaintiff minister of an additional NOI faith group did not violate Allah's First Amendment rights.

### 3. *Refusal to Allow Group Exercise in the Yard*

█ Defendants claim that, due to security concerns regarding gang activity, close group activity such as calisthenics in the Yard is prohibited. According to defendants, prison policy permits only ten inmates in one group during Yard Out. Chesney Dep. at 31. This is to prevent inmates from congregating where their conversations cannot be readily overheard. Plaintiff responds that prison officials allow more than ten inmates to play sports such as baseball, football, and volleyball. *Id.* at 30.

Applying *Turner,* this claim cannot survive summary judgment. Clearly, there is a valid rational connection between limiting close group activity and the prison's interest in controlling gang activity. While team sports are permitted, all other group activity is prohibited within the institution unless the superintendent authorizes the activity in writing. In *Cooper v. Tard,* the Third Circuit upheld a ban against unsupervised group activity involving a religious group and discussed the legitimate government interest in banning group activity. According to the court,

> what plaintiffs did was to establish a leadership structure within the prison alternative to that provided by the lawful authorities .... Under this alternative authority structure, plaintiffs proposed to engage in daily group activity, and therefore set themselves apart from the other inmates as an affinity group and made the group's existence obvious to other inmates and prison officials. Such a structure posed a potential threat to prison authority that caused reasonable concern among defendants. Therefore, there was a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it.

855 F.2d 125, 129 (3d Cir.1988). While plaintiff argues that he did not wish to participate in unsupervised group activity, prison officials cannot closely monitor group activities in the Yard to ensure that conversations are not gang related. Arguably, prison officials could monitor the exercises closely to ensure that inmates are not congregating and holding conversations. However, this would entail increased supervision. Even though plaintiff argues that the cost of accommodating his request is minimal, the risk of gang activity imposes a high cost on other inmates, guards, and prison resources generally. Furthermore, the Third Circuit has directed lower courts to defer to prison administrators when the penological interest involves security. *See Fraise*, 283 F.3d at 516. As noted above, the plaintiff also retained alternative means of exercising his religion. In balancing all of the factors in *Turner*, this court finds that the prison regulation prohibiting group calisthenics in Yard Out is reasonably related to the penological interest of ensuring security by limiting unsupervised close group activity that could shelter gang activity.

### 4. Failure to Provide Adequate Ramadan Meals

■ The DOC and SCIF approved the NOI's request to observe Ramadan and prepared menus in accordance with the NOI's restrictions. However, some of the menus included prohibited food such as kidney beans and peanut butter. In addition to this prohibited food, plaintiff claims that he was served meat during Ramadan. According to defendants, plaintiff concedes that he consumed only one meal a day during the fast. Defendants note that the plaintiff saved breakfast to eat after sundown if dinner included prohibited food. Defendants argue that, with the additional breakfast food, plaintiff retained the option of fasting according to his beliefs. Plaintiff responds that there exists a genuine issue of material fact as to whether he was able to observe his religious beliefs by saving these breakfasts. There is no dispute that defendants created alternative meals for those NOI followers participating in Ramadan. Furthermore, there is no dispute among the parties that some of the Ramadan meals contained prohibited food such as kidney beans, lima beans, etc. Therefore, the question becomes whether the failure of defendants to provide entirely appropriate meals during Ramadan violated the plaintiff's free exercise rights.

In *DeHart v. Horn*, a Buddhist inmate sued prison officials alleging a First Amendment violation for refusing to provide a vegetarian diet. 227 F.3d 47 (3d Cir.2000) (en banc). Reversing the district court's grant of summary judgment in favor of defendants, the Third Circuit criticized the lower court's application of *Turner's* factors. However, the appellate court agreed with the district court's analysis of *Turner's* first factor and found that the defendants' refusal to provide vegetarian meals was rationally related to the legitimate interests of an efficient food system and avoiding inmate jealousy. *Id.* at 52–53. In the present case, the defendants attempted to accommodate the Ramadan meal restrictions and followed the Ramadan action plans submitted by Al–Hafeez and the plaintiff, neither of which included the prohibition against beans. In their motion for summary judgment, however, defendants do not attempt to justify this oversight with a legitimate government interest. Instead, defendants simply argue that there was no violation because plaintiff could observe the fast by hoarding food from breakfast. According to defendants, plaintiff had alternative means of observing the Ramadan fast and exercising his religion, therefore the prison's policy was reasonably related to penological interests.

In discussing the second factor in *Turner*, it is useful to examine the court's ruling in *Allah v. Stachelek*, No. CIV.A. 95–7593, 1998 WL 281930 (E.D.Pa. May 29, 1998), *appeal dismissed by, Allah v. Stachelek*, 178 F.3d 1278 (3d Cir. Mar 31, 1999) (Table). The plaintiff in *Stachelek* was the same plaintiff now before this court. In the earlier lawsuit, plaintiff sued the prison officials at SCI Graterford alleging a similar constitutional violation involving Ramadan meals. *See Allah v. Stachelek*, No. CIV.A. 95–7593, 1998 WL 281930 (E.D.Pa. May 29, 1998). In *Stachelek*, the plaintiff, along with other inmates, claimed that prison officials violated his free exercise rights by refusing to provide a meat-free diet during Ramadan. The *Stachelek* court found no constitutional violation. According to the court, the plaintiffs failed to demonstrate that defendants' refusal was "tantamount to placing a restriction on their ability to practice their religion." *Id.* at *14. Finding that inmates had "opportunities to supplement their diets with other foods which were not counter to their religious beliefs [and] opportunities for individual prayer," the court found that plaintiffs had alternative means of exercising their religion. *Stachelek* is similar to the present case. Here, plaintiff had the opportunity to pray and study his religion. Furthermore, plaintiff could reserve his breakfast meals to supplement his Ramadan dinner. Therefore, plaintiff retained alternative means of exercising his religion and this factor weighs in the defendants' favor.

According to the plaintiff, rather than beans, fish was the appropriate protein alternative for the Ramadan menus. Under *Turner*, this court must consider the costs of fully accommodating the plaintiff's free exercise rights—in this instance, the Ramadan restrictions. Defendants fail to address this factor as well. In assessing *Turner's* final factor, a court must also consider whether there are alternatives that fully accommodate the prisoner's rights at de minimus costs to valid penological interests. The only alternative that fully accommodates the plaintiff's rights is a menu with fish or non-prohibited beans as the entree. However, there is no evidence in the record concerning the costs of such an alternative and defendants fail to address this factor as well.

Defendants have failed to meet their burden in showing that the prison's Ramadan policy was reasonably related to legitimate penological interests. Defendants neglected to offer any governmental interest for the deficient Ramadan meal, and failed to address why an appropriate menu alternative was too costly. While the plaintiff may have been able to use the breakfast meals as supplements, there exists a genuine issue of material fact as to whether these breakfasts fully accommodated plaintiff's right to observe the Ramadan fast and exercise his religion. Therefore, at this stage of the proceedings, defendants have failed to establish that they are entitled to judgment as a matter of law under *Turner*.[10]

### B. Retaliation Claim

■ In order to make out a prima facie case for retaliation against prison officials, an inmate must prove that: 1) he engaged in constitutionally protected conduct; 2) he suffered "adverse action" at the hands of prison officials; and 3) his constitutionally

---

**10.** While the court finds that defendants failed to meet their burden with this particular claim, the court notes that there is no evidence in the record, other than plaintiff's mere allegations, that he was fed meat during Ramadan. Furthermore, there is no evidence in the record that *any* of the defendants were responsible for serving the plaintiff meat. Therefore, plaintiff has failed to show more than a mere scintilla of evidence in support of this specific allegation.

protected conduct was a substantial or motivating factor in the decision to discipline him. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.2001). Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision absent the protected conduct for reasons reasonably related to penological interest. *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir.2002). In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ In this case, plaintiff claims that prison officials filed misconduct charges against him to retaliate for filing a lawsuit forcing the DOC to recognize the NOI as a religious group as well as filing grievances alleging violations of his First Amendment free exercise rights. Because both filing a lawsuit and filing grievances are protected activities, *see Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997) (finding that the filing of a lawsuit is protected activity); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir.2000) (holding that an inmate has a First Amendment right to file grievances against prison officials); *Rivera v. Chesney*, 1998 WL 639255, *1 (E.D.Pa.) (finding that filing grievances against prison officials is protected activity); *Hill v. Blum*, 916 F.Supp. 470, 473–74 (E.D.Pa.1996) (same), plaintiff has fulfilled the first requirement of the prima facie case for retaliation.

To show an "adverse action," the plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah v. Seiverling*,

229 F.3d 220, 225 (3d Cir.2000). Prison officials filed four separate misconduct charges against the plaintiff. Although two of the misconduct charges were ultimately dismissed, a plaintiff "need not show a separate, independent injury as an element of the case." *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir.1994). "Because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself." *Id.* Therefore, plaintiff has fulfilled the second element of the prima facie case.

The plaintiff argues that the third element of the prima facie case is satisfied because prison officials issued all the misconduct charges after Allah first alleged the First Amendment violations. Plaintiff filed his first grievance alleging a constitutional violation of his free exercise rights on September 19, 1996. Other grievances followed on September 30, 1996, October 9, 1996, and December 8, 1996. Plaintiff received his first misconduct charge on November 12, 1996. Subsequently, plaintiff received two misconduct charges on February 6, 1997, and a final misconduct charge on March 5, 1997. A suggestive temporal proximity between protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facie case. *See Rauser v. Horn*, 241 F.3d 330 (3d Cir.2001); *Johnson v. Rendell*, 56 F.Supp.2d 547, 552 (E.D.Pa.1999). Here, plaintiff filed a grievance and received his first misconduct charge nearly two months after filing the charge. Two months after filing another grievance, defendants charged the plaintiff with two additional misconducts. Finally, nearly three full months after filing his last grievance, plaintiff received another misconduct charge. This temporal proximity alone cannot establish that the plaintiff's protected activity was a substantial or

motivating factor of the plaintiff's misconduct charges. Plaintiff points to depositions of other inmates claiming that the guards oppressed NOI members and hassled them because of their religion. *See* Ex. 38 at 6, 32 at 7, 41 at 7,9. However, these allegations are not specific to any of the defendants named in the plaintiff's retaliation claims. Plaintiff has failed to provide more than a mere scintilla of evidence that there is a causal relationship between his protected activity and his misconduct charges. Therefore, plaintiff has failed to carry his burden.

Even if the plaintiff could satisfy the causation requirement of the prima facie case, his retaliation claim would fail because the defendants' decisions were reasonably related to legitimate penological interests. Once a prisoner demonstrates that his protected activity was the substantial or motivating factor for his discipline, defendants may still prevail by proving by a preponderance of the evidence that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. Plaintiff argues defendants have offered no evidence to show that they would have taken the same actions absent the plaintiff's protected activity. The Third Circuit's recent ruling in *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir.2002), is illustrative. In *Carter*, the prisoner-plaintiff alleged that prison officials issued misconduct charges against him in retaliation for assisting other inmates in filing legal claims. The appellate court upheld the lower court's grant of summary judgment and reasoned, "[g]iven the quantum of evidence of Carter's misconduct, we cannot say that prison officials' decision to discipline Carter for his violations of prison policy was not with the 'broad discretion' that we must afford [the defendants.]" *Id.* at 158. Based on the evidence in the record including the misconduct reports, this court cannot sec-

ond guess the prison officials and find that the defendants' actions were not reasonably related to legitimate penological interests.

### C. Due Process

■ In order to establish that the state has violated an individual's right to procedural due process, a plaintiff must (1) demonstrate the existence of a protected interest in life, liberty or property that has been interfered with by the state, and (2) establish that the procedures attendant upon that deprivation were constitutionally insufficient. See *Board of · Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As the Supreme Court has noted,

> [t]he function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.

*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

Plaintiff alleges that defendant Kraynak violated his procedural due process rights by destroying the confiscated property prior to the final determination of his grievance. Defendants argue that Allah lacks the requisite property interest to trigger due process protection. Furthermore, the defendants contend that Allah received adequate due process through the prison grievance procedure. Plaintiff disputes both these arguments.

In *Tillman v. Lebanon County Corr. Facility*, the Third Circuit found that a

prison grievance procedure provided an adequate post-deprivation remedy, thereby satisfying due process. 221 F.3d 410 (3d Cir.2000). *Tillman* involved a prisoner who was assessed a fee of $10.00 per day for housing costs stemming from two periods of incarceration. During the prisoner's second period of confinement, prison officials confiscated half of the funds in his wallet and half of all funds sent on his behalf to pay for the assessments. In finding no due process violation, the court held that the prison's grievance process was a sufficient post-deprivation remedy for purposes of due process. *Id.* at 422. In the present case, plaintiff grieved the destruction of his property on April 24, 1997. Ex. 10 at 3. The grievance officer found that the property was destroyed according to established guidelines. Ex. 10 at 4. The Central Office Review Committee reviewed the grievance officer's determinations and found the responses reasonable and appropriate. Because there was due process in the grievance procedures, defendant Kraynak is entitled to summary judgment on this claim.

*D. Qualified Immunity*

■ While the prison official's failed to meet their burden in showing that the Ramadan policy was reasonably related to legitimate penological interests, defendants assert they are entitled to summary judgment on the basis of qualified immunity. A public official is entitled to qualified immunity from monetary damages unless a reasonable official in his position would know that his specific conduct violated clearly established rights. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[T]he right in question should be defined in a particularized and relevant manner, rather than abstractly." *Doe v. County of Centre,* 242 F.3d 437, 454 (3d Cir.2001) (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). This court defines the right in question as

the right of a prisoner to receive the Ramadan meal excluding meat and beans. Assuming *arguendo* that the law is clearly established regarding whether an inmate has a right to receive a Ramadan meal, *but see DeHart v. Horn,* 227 F.3d 47, 60 n. 8 (3d Cir.2000) (describing the varying appellate court opinions dealing with religious diets in prisons), reasonable officials in the positions of the defendants would not have known they were committing a constitutional violation. Neither plaintiff's Ramadan action plan nor minister Al-Hafeez's action plan mentioned the bean prohibition. Defendants attempted to observe Ramadan meal restrictions yet failed by including beans in the menu. A reasonable official would not have known that this conduct violated the prisoner's constitutional rights. Therefore, defendants are entitled to qualified immunity for the deficient Ramadan meals.

■ While plaintiff's other claims fail because defendants did not violate his constitutional rights as a matter of law, the court notes that, in the alternative, defendants would also be entitled to qualified immunity on the First Amendment as well as Due Process claims. Reasonable prison officials would not have known that excluding a disruptive inmate from religious services, prohibiting group calisthenics in the Yard, or failing to hire an additional NOI minister violated clearly established law. Furthermore, a reasonable officer in defendant Kraynak's position would not have known that destroying the plaintiff's property four and a half months after the confiscation violated the plaintiff's constitutional rights. Therefore, defendants would be immune from suit and entitled to summary judgment on these claims.

Defendants also argue, in the alternative, that they are entitled to qualified immunity on the retaliation claim. The Third Circuit, in *Larsen v. Senate of Com.*

*of Pa.*, 154 F.3d 82 (3d Cir.1998), discussed the qualified immunity analysis for a First Amendment retaliation claim. In *Larsen,* the court wrote:

> The qualified immunity analysis requires a determination as to whether reasonable officials could believe that their conduct was not unlawful even if it was in fact unlawful. In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory. Even assuming that this could be demonstrated under a certain set of facts, it is an inquiry that cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations, and thus cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to adduce evidence in support of the allegations that the true motive for the conduct was retaliation rather than the legitimate reason proffered by the defendants.

*Id.* at 94 (citations omitted). However, the *Larsen* court noted that a bare allegation of retaliatory motive is not sufficient to defeat an assertion of qualified immunity. *Id.* at 95. According to the court, "[i]n some circumstances the legitimate basis for the actions might be so apparent that the plaintiff's allegations of retaliatory motive could not alter the conclusion" that defendants are entitled to qualified immunity. *Id.* In the present case, the defendant prison officials had a legitimate basis for filing and handling the misconduct charges. While plaintiff argues that facts material to the reasonableness of defendants' beliefs and actions are in dispute, his claims are merely bare allegations. Therefore, defendants are entitled to qualified immunity on the retaliation claim.

### E. Declaratory Relief

In the amended complaint, plaintiff seeks declaratory relief for all counts. Because the plaintiff is no longer residing at SCIF, his claims for declaratory relief are moot.

### III. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted.

An appropriate order follows.